IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BRITTNEY McDOUGLE, INDIVIDUALLY, AND ON BEHALF
OF THE HEIRS AND WRONGFUL DEATH BENEFICIARIES
OF MICHAEL D. McDOUGLE, DECEASED, AND THE ESTATE
OF MICHAEL McDOUGLE, THROUGH MARY McDOUGLE, THE
ADMINISTRATOR OF ESTATE                              PLAINTIFFS

V.                       CIVIL ACTION NO. 3:15-cv-00350-CWR-FKB

NESHOBA COUNTY, MS, SHERIFF TOMMY WADDELL, IN
HIS OFFICIAL CAPACITY, CITY OF PHILADELPHIA, MS,
CHIEF GRANT MEYERS, IN HIS OFFICIAL CAPACITY,
NESHOBA COUNTY GENERAL HOSPITAL AND OFFICERS BRAD
CROCKETT, ERIC LOWNDES, BRANDON POPE, JOSH RAY,
AND "JOHN DOES 1-6", ALL IN THEIR INDIVIDUAL AND
OFFICIAL CAPACITIES                                   DEFENDANTS


DEPOSITION OF OFFICER ERIC LYONS


Held on Monday, August 15, 2016, at 1:40 p.m., in the

Offices of Robert Thomas, Esquire, 435 Center Avenue North,

Philadelphia, Mississippi, at the instance of the Plaintiffs


Appearances Noted Herein


REPORTED BY:

    KAREN C. POPERNIK, MS CCR 1276, TN LCR 469

    RBK Reporting Services

    P. O. Box 1683, Oxford, MS  38655

    662.234.7804, karenedge2@gmail.com

EXHIBIT "B"

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3        CARLOS E. MOORE, ESQUIRE
 4        Moore Law Group, P.C.
 5        P. O. Box 1487
 6        Grenada, MS  38902
 7        Carlos@carlosmoorelaw.com
 8
 9   REPRESENTING THE NESHOBA COUNTY DEFENDANTS:
10        STEVEN J. GRIFFIN, ESQUIRE
11        Daniel, Coker, Horton & Bell, P.A.
12        P. O. Box 1084
13        Jackson, MS  39215
14        Sgriffin@danielcoker.com
15
16   REPRESENTING THE CITY OF PHILADELPHIA DEFENDANTS:
17        JACK PRICE, ESQUIRE
18        Wise Carter Child & Caraway, P.A.
19        P. O. Box 651
20        Jackson, MS  39205
21        Jdp@wisecarter.com
22             Also Present:  Chief Grant Myers and Josh Ray
23
24
25
```

```
 1  enforcement unit.
 2       Q.   And as a regular Sergeant, did you supervise anyone?
 3       A.   No, sir.
 4       Q.   Do you supervise anyone as a Staff Sergeant?
 5       A.   No, sir.
 6       Q.   But is this a position that you get more pay or do
 7  you have more duties or what?
 8       A.   Well, patrol officers who have that rank are
 9  supervisors.  I work DUI enforcement.  I'm not part of patrol.
10  So I'm basically my own deal.
11       Q.   Okay.  How did you happen to respond to the breaking
12  and entering on West Atkins on 11-1?
13       A.   Dispatch give a call out of a B&E, breaking and
14  entering, in progress.  I recognized that -- heard on the radio
15  where Officer Pope and Officer Ray were out on another detail
16  dealing with something else.  I was fairly close to the
17  address.  I responded.  I could get there quicker than anybody
18  else, so I responded.
19       Q.   And did you have anyone with you when you responded?
20       A.   No, sir.
21       Q.   Have you been involved in any other lawsuits besides
22  this litigation?
23       A.   Just divorce and child support, no, sir.
24       Q.   Okay.  Have you ever been terminated from any job?
25       A.   No, sir.
```

1    A.   No idea, sir.  I had assistance from Billy Seales at
2  the residence.  I had his arms.  Mr. Billy had his legs or vice
3  versa.  He had the legs while I had the arms, and myself and
4  Billy attempted to get him under control, and he would kick and
5  pull and push, and one time he attempted to bite.  So --
6    Q.   Okay.  I don't have 001, 2, and 3.  My numbers start
7  off at, I think, 4 for whatever reason.  Can you give me a copy
8  of this?
9         BY MR. PRICE:  Let me make a few.
10             (Off-the-record discussion.)
11 CONTINUING:
12   Q.   Back on the record.  I'm handing you a document that's
13 been produced as Neshoba County 4, 5, and 6.  Is this your
14 report of what happened, your written report of what happened
15 that night?
16   A.   Yes, sir.
17   Q.   And your badge number is 85?
18   A.   Yes, sir.
19   Q.   This report doesn't bear your signature, does it?
20   A.   (Reviews.)  Not this copy, no, sir.
21         BY MR. MOORE:  We'll have it marked as the next
22 exhibit.
23             (LYONS REPORT MARKED AS EXHIBIT NO. 4.)
24   Q.   (By Mr. Moore)  2147 is what time?
25   A.   9:47.

1    Q.   So you reported to the seen of 285 West Atkins Street
2  at 2147 hours?
3    A.   Yes, sir.
4    Q.   All right.  And tell me what happened, what you
5  immediately see once you got there to the scene.
6    A.   When I got there, I observed a black male subject and
7  another black male subject in the doorway.  I approached the
8  doorway.  I observed the black male subject I knew to be Billy
9  Seales on top of the other black subject that I also knew to be
10 Michael McDougle.
11   Q.   Was Michael McDougle laying on his back or stomach?
12   A.   I don't remember what he was laying on, sir.
13   Q.   Okay.  Had he crossed the threshold?
14   A.   He was in the threshold in the doorway.  Mr. Billy
15 Seales saw me.  I approached with my handcuffs going to
16 handcuff McDougle.  Billy got up.  At that time, Michael
17 started kicking and pulling away and just kind of going crazy.
18 I grabbed his legs or his foot.  Mr. Billy grabbed his legs or
19 his foot, and I had one or the other, and we was attempting to
20 get him under control.  He continued to kick and pull away, and
21 at one time attempted to bite me.  I let him go.  I asked
22 Mr. Billy Seales to --
23   Q.   Did he bite you or not?
24   A.   No, he didn't bite me.
25   Q.   Okay.

|    |    |                                                                      |
|---:|----|----------------------------------------------------------------------|
| 1  | Q. | So you reported to the seen of 285 West Atkins Street                |
| 2  |    | at 2147 hours?                                                       |
| 3  | A. | Yes, sir.                                                            |
| 4  | Q. | All right. And tell me what happened, what you                       |
| 5  |    | immediately see once you got there to the scene.                     |
| 6  | A. | When I got there, I observed a black male subject and                |
| 7  |    | another black male subject in the doorway. I approached the          |
| 8  |    | doorway. I observed the black male subject I knew to be Billy        |
| 9  |    | Seales on top of the other black subject that I also knew to be      |
| 10 |    | Michael McDougle.                                                    |
| 11 | Q. | Was Michael McDougle laying on his back or stomach?                  |
| 12 | A. | I don't remember what he was laying on, sir.                         |
| 13 | Q. | Okay. Had he crossed the threshold?                                  |
| 14 | A. | He was in the threshold in the doorway. Mr. Billy                    |
| 15 |    | Seales saw me. I approached with my handcuffs going to               |
| 16 |    | handcuff McDougle. Billy got up. At that time, Michael               |
| 17 |    | started kicking and pulling away and just kind of going crazy.       |
| 18 |    | I grabbed his legs or his foot. Mr. Billy grabbed his legs or        |
| 19 |    | his foot, and I had one or the other, and we was attempting to       |
| 20 |    | get him under control. He continued to kick and pull away, and       |
| 21 |    | at one time attempted to bite me. I let him go. I asked              |
| 22 |    | Mr. Billy Seales to --                                               |
| 23 | Q. | Did he bite you or not?                                              |
| 24 | A. | No, he didn't bite me.                                               |
| 25 | Q. | Okay.                                                                |

Karen C. Popernik, MS CCR 1276, RBK Reporting, 662-234-7804

```
 1  and got on the ground.  Can you tell me how?
 2       A.   He was pulling away or attempting to run away?
 3       Q.   Okay.  Did he run away or not?
 4       A.   He didn't run away.  I had ahold of him.
 5       Q.   You tackled him?
 6       A.   I didn't tackle him.  I wrapped him up, and we went
 7  to the ground.
 8       Q.   What is a tackle?
 9       A.   A tackle is me running at him and knocking him down,
10  basically.  This was not a tackle.  This was more of a
11  takedown, not a tackle.
12       Q.   Okay. So you took him down?
13       A.   Took down, yes, sir.
14       Q.   And what part of his body landed on the ground?
15       A.   I don't remember what part of his body hit the
16  ground, sir.
17       Q.   Okay.  What happened next?
18       A.   I laid on top of him as I saw Mr. -- as I saw
19  Mr. Seales doing when I got there.  I laid on top of him.  I
20  asked the homeowner, Billy Seales and a female subject to grab
21  my radio.  I don't remember which one grabbed my radio and gave
22  it to me.  I advised dispatch that I needed some help with this
23  subject.  At that time, officers were dispatched.  Officers
24  were in route.  Brad Crockett showed up first.  I advised Brad
25  to grab one arm.  I grabbed one arm.  Brad Crockett grabbed the
```

1  other arm.  Mr. Billy Seales had the handcuffs and brought them
2  to us, and all three of us helped put the handcuffs on him.
3       Q.   Okay.  And after he was handcuffed, what happened?
4       A.   I got up.  Officer Crockett got up.  We all got up
5  and McDougle was laying there.  He was just moaning and
6  growling.
7       Q.   Did you call 911 at this point?
8       A.   No, sir, I did not.
9       Q.   You heard him moaning and groaning.  Why didn't you
10 call 911?
11           BY MR. PRICE:  He said growling.
12      A.   Growling, yes, sir.
13      Q.   (By Mr. Moore)  Moaning and growling.  Let's make
14 sure we enunciate our words so they are heard clearly.
15      A.   Yes, sir.
16      Q.   So why was the ambulance or 911 not called once he
17 was moaning and growling?
18      A.   It's not unusual for somebody to growl.  I didn't
19 think he was injured or seriously sick or injured for me to
20 call 911 at that moment.
21      Q.   Do people in Philadelphia growl normally?
22      A.   No, sir.
23      Q.   You said it's not unusual for someone to growl?
24      A.   Not being injured, no, sir.  Not for me to have to
25 call 911 on, no, sir.

1  Q.  You don't know?
2  A.  No, sir, I don't.
3  Q.  Do you know when someone is out of their mind?
4  A.  No, sir.
5  Q.  Did he appear to be out of his mind that night?
6  A.  He appeared not to be himself.
7  Q.  Did he appear to be under the influence of drugs?
8  A.  Yes, sir.
9  Q.  What type of drugs?
10 A.  I have no idea.
11 Q.  Illicit drugs?
12 A.  I don't know, sir.
13 Q.  Or prescription drugs?
14 A.  I don't know, sir.
15 Q.  Did he appear to be under the influence of alcohol?
16 A.  I did smell alcohol, but this was more than alcohol.
17 Q.  So you knew he was under the influence of an
18 intoxicating substance or intoxicating substances?
19 A.  Yes.
20 Q.  Did you believe that he needed to be detoxed?
21 A.  Yes, sir.
22 Q.  So why didn't you take him to the hospital?
23 A.  Because we took him to the jail. I had EMS to check
24 on him at the jail.
25 Q.  Did you call EMS?

1     A.    I did not.
2     Q.    Who called EMS?
3     A.    Myself and Sergeant Ray were on scene discussing
4  whether to take him to the jail or to the hospital.  We
5  discussed it and decided that I had -- I already had the fight
6  with him, tussle with him.  Billy Seales already had a scuffle
7  with him.  We thought if we get him to the jail and get him in
8  an ambulance, we'll get him to the hospital, and that he would
9  start again being combative.  We thought it would be best to
10 take him to the jail in a controlled environment and have EMS
11 to look at him.  And if EMS determined that he needed to be
12 transported to the hospital, then we would assist them in doing
13 so.
14    Q.    But you knew he was in handcuffs at this point?
15    A.    Yes, sir.
16    Q.    And how did you think he was going to be combative in
17 handcuffs.
18    A.    I've seen several people combative in handcuffs, sir.
19    Q.    But he was not combative at this point while y'all
20 were discussing it, did you -- were you?
21    A.    No, sir.
22    Q.    He was calm at this time?
23    A.    Well, he was in handcuffs, yes.
24    Q.    Okay.  My point exactly.  So why did you and
25 Sergeant Ray take it upon yourselves to go against the policy?

1        BY MR. PRICE:  Object to the form of the
2   question.
3        Q.   (By Mr. Moore):  Are you familiar with the policies
4   of a Staff Sergeant?
5        A.   Yes.
6        Q.   That if an officer determines a prisoner to be
7   seriously ill or injured upon arrest, the prisoner will be
8   transported to Neshoba General Hospital for treatment before
9   being processed at the appropriate detention facility.  Could
10  it be any clearer than that?
11           BY MR. PRICE:  Object to the form.
12       A.   Sir, I did not determine that Michael was sick --
13  seriously sick or injured at the time.
14       Q.   (By Mr. Moore):  So why were you and Sergeant Ray
15  discussing it, then, to see if he should go to hospital or have
16  EMS?
17       A.   Because he was incoherent and disoriented and
18  intoxicated.  So we thought it would be best for him to be
19  checked out before we took him to the jail, sir.  And since EMS
20  was already in route to the jail on an unrelated matter, we
21  decided to let EMS check him in a controlled environment at the
22  jail.
23       Q.   So y'all put a controlled environment more important
24  than his health?
25       A.   Sir, we --

1    Q.   I'm Steven Griffin.  I represent the County here.  In
2  your written statement, you talked about when the EMS folks
3  came and checked on Mr. McDougle at the jail.
4    A.   Yes, sir.
5    Q.   And you were there when they were checking him out?
6    A.   Yes, sir.
7    Q.   And you were there when they finished checking him
8  out?
9    A.   Yes, sir.
10   Q.   And you put in your report that, "Based on what I
11 gathered, he was okay to remain at the jail."  What do you
12 recall the EMS personnel saying about that?
13   A.   I don't recall really.
14   Q.   Okay.  But you remember him -- the EMS people saying
15 that he could stay at the jail that night?
16        BY MR. MOORE:  Object to the form of the
17 question.  It's leading.
18        BY MR. GRIFFIN:  I'm sorry?
19        BY MR. MOORE:  I object to the form of the
20 question, leading.
21        BY MR. GRIFFIN:  Well, he's not my client.  It's
22 not a leading question.  This is cross-examination.  That's
23 fine.
24   A.   Say it again.
25   Q.   (By Mr. Griffin):  Sure.  Did the EMS personnel

```
 1  indicate that Mr. McDougle was okay to remain at the jail that
 2  night?
 3       A.   Yes.
 4            BY MR. MOORE:  Object.
 5       Q.   (By Mr. Griffin):  And you've reviewed the typed-out
 6  statement that we have here in front of you?
 7       A.   Yes.
 8       Q.   That's Exhibit No. 4?
 9       A.   Yes, sir.
10       Q.   And is everything that's in your typed-out statement
11  true and correct to the best of your knowledge?
12       A.   It is.
13            BY MR. GRIFFIN:  Okay.  No further questions.
14
15  EXAMINATION BY MR. MOORE:
16       Q.   Who, if anyone, do you believe is at fault for the
17  death of Mr. McDougle?
18            BY MR. GRIFFIN:  Object to the form.
19       A.   Don't know, sir.
20       Q.   (By Mr. Moore):  Do you believe anyone in the County
21  is responsible?
22            BY MR. GRIFFIN:  Object to the form.
23       A.   Don't know, sir.
24       Q.   (By Mr. Moore):  Do you believe the County personnel
25  could have checked on him more?
```