IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BRITTNEY MCDOUGLE, INDIVIDUALLY, ET AL.               PLAINTIFF

VS.                                    CIVIL ACTION NO. 3:15-cv-350-CWR-FKB

NESHOBA COUNTY, MISSISSIPPI , ET AL.                  DEFENDANTS

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF
## NESHOBA COUNTY, SHERIFF TOMMY WADDELL, AMANDA MONK,
## EVELYN MCBEATH, HARVEY HICKMON, BURTON O'BERRY, AND
## JOEY CURRY'S MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Neshoba County, Mississippi, Sheriff Tommy Waddell, in his

official capacity, and Jailers Amanda Monk, Evelyn McBeath, Harvey Hickmon, Burton O'Berry,

Jamie Hutchinson, and Joey Curry, in their individual and official capacities ("Neshoba County

Defendants"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and file

this their Memorandum of Authorities in support of their Motion for Summary Judgment, as follows:

### INTRODUCTION

Plaintiffs filed this civil action asserting federal claims pursuant to 42 U.S.C. § 1983 arising

out of the arrest of Michael D. McDougle, Sr. ("McDougle") by the Philadelphia Police Department

and his subsequent death while in custody at the Neshoba County Jail.  *See* Fourth Amended

Complaint, Doc. [124].  Plaintiffs allege the violation of McDougle's constitutional rights under the

Fourth and Fourteenth Amendments.  *Id*.  Plaintiffs further assert state law claims pursuant to the

Mississippi Tort Claims Act ("MTCA"), MISS. CODE ANN. § 11-46-1, *et seq*.  *Id*.

As set forth in more detail below, Jailers Amanda Monk, Evelyn McBeath, Harvey Hickmon,

Burton O'Berry, Jamie Hutchinson, and Joey Curry have qualified immunity from each of Plaintiff's

constitutional claims against them in their individual capacities under Section 1983.  Additionally,

Plaintiffs have failed to establish that a policy or custom of Neshoba County was the moving force behind any alleged violation of McDougle's constitutional rights, and there is no basis for any claim under Section 1983 against Neshoba County, Sheriff Waddell, or any of the jailers in their official capacities. These Defendants also have immunity from Plaintiffs' state law claims against them under the MTCA pursuant to Miss. Code Ann. § 11-46-7(2) and § 11-46-9(1)(m). Plaintiffs' state law claims are also barred because they failed to comply with the MTCA's mandatory pre-suit notice requirements. MISS. CODE ANN. § 11-46-11.

Accordingly, there are no genuine issues of material fact as to any of Plaintiffs' claims against these Defendants, and these Defendants are entitled to judgment as a matter of law.

## FACTUAL BACKGROUND

Late on the evening of November 1, 2014, Michael D. McDougle, Sr. ("McDougle"), a 29-year-old male, busted through the front screen door of the residence of Billy Seales and then busted through the deadbolt lock. *See* Seales Dep., Exh. "A," at 17, 50. Seales then threw McDougle to the floor and held him down while his girlfriend, Polly Boler, called the police. *Id*. At 9:47 p.m., 911 dispatch received a call from Boler reporting that someone had broken into their house and requesting police assistance. *See* PPD Incident Report (Officer Lyons), Doc. [26-1].

When Sergeant Eric Lyons of the Philadelphia Police Department ("PPD") arrived on scene several minutes later, Seales was holding McDougle down in the doorway of the house. *See* Lyons Dep., Exh. "B," at 17:4-10. Lyons ordered McDougle to turn over onto his stomach, but he failed to comply. *Id*., at 18:7-9. Lyons approached with his handcuffs, and Mr. Seales got up off McDougle. *Id*., at 17:14-16. At that point, McDougle began kicking and pulling away and "going crazy." *Id*.,at 17:16-17. When McDougle attempted to bite Lyons, Lyons let him go. *Id*., at 17:20-

21. At that point, Lyons attempted to tase McDougle "center mass," but it appeared to have no effect.[1] *Id.*, at 18:1-3. Lyons grabbed McDougle again, but McDougle continued to pull and attempt to run away, and they fell to the ground next to the porch. *Id.*, at 18:11-19:13. Lyons then laid on top of McDougle to restrain him and used his radio to request assistance from additional officers. *Id.*, at 19:18-23. Lyons described McDougle has having "unbelievable strength." *Id.*, at 30:18-32:16. PPD Officer Brad Crockett arrived a few minutes later and assisted Lyons with handcuffing McDougle while Seales helped hold him. *Id.*, at 19:24-20:2. McDougle was making moaning and groaning sounds, and officers suspected he was under the influence of drugs at the time. *Id.*, at 22:7-19.

The officers discussed whether to take McDougle to the hospital for evaluation or to transport him to the jail. *See* Exh. "B," at 23:3-4. Because EMS was already en route to the jail on an unrelated matter and because McDougle had been combative with Seales and the responding officers, they ultimately decided to transport McDougle to the jail and have him evaluated by EMS in a controlled environment. *Id.*, at 23:4-13, 24:14-22, 25:11-19. McDougle was taken to the county jail just a couple blocks away and booked on charges of breaking and entering, disorderly conduct, and resisting arrest. *See* Arrest/Booking Report, Doc. [26-4].

At the jail, McDougle could not walk on his own, so Lyons and Ray carried him from the patrol car to the isolation cell in the jail's booking area. *See* Exh. "B," at 36:10-19. Surveillance video shows the officers holding McDougle under each of his arms, with McDougle's feet dragging the floor as they carried him. *See* Video, Exh. "C." Officers laid McDougle down on a fresh mat

---

[1] McDougle's autopsy report confirmed there were no taser barb impact marks anywhere on his body, which explains why the taser had no effect. *See* Autopsy Report, Doc. [26-5].

and blanket on the floor of the isolation cell.  *See* Exh. "B," at 36:24-37:3.

At approximately 10:30 p.m., McDougle was examined by nationally-registered paramedics Brandi Wyatt and Dereck Moore.  *See* PPD Incident Reports, Doc. [26-1]; Jailer Reports, Doc. [26-2]; EMS Records, Doc. [26-7]; Wyatt Dep. , Exh. "D," at 7-8, 27; Moore Dep., Exh. "E," at 8. Officers told the paramedics that McDougle had been tased prior to being brought to the jail, and they also reported McDougle's extensive history of drug abuse.  *See* EMS Records, Doc. [26-7]. Although McDougle appeared to be agitated and refused to answer certain questions, the paramedics found McDougle responsive and oriented.  *See* Exh. "D," at 37-38, 45-46; Exh. "E," at 24-25, 36. The paramedics found that McDougle had good blood circulation, a normal pulse, normal pupils, and only slightly elevated respiration and blood glucose levels.  *See* Doc. [26-7]; Exh. "D," at 17-18, 20, 38-39; Exh., "E," at 26-27, 35-36.  They also found no obvious signs of trauma, serious injury or illness, or life-threatening conditions.  *See* Doc. [26-7]; Exh. "D," at 39-40, 53-55; Exh. "E," at 37, 45, 47, 49-50.  Both paramedics testified that based on their examination of McDougle at the jail, they did not believe it was necessary to consult with an ER physician regarding McDougle's medical condition.  *See* Exh. "D," at 55:15-25; Exh. "E," at 52:7-53:17.  They further testified they did not find anything during their examination of McDougle that warranted transporting him to the ER for further evaluation.  *See* Exh. "D," at 56:21-57:7; Exh. "E," at 51:21-52:2.  They also both testified that if they had believed he needed to be transported, they would have done so.  *See* Exh. "D" at 57:8-10; Exh. "E," at 52:3-6.  McDougle himself verbally indicated to paramedic Moore that he did not wish to go to the hospital.  *See* Exh. "E," at 20:23-21:9.

After the paramedics determined that McDougle did not need to be transported to the ER, they instructed jail officials to watch him and to call back if necessary or if they became concerned

about him. Exh. "D," at 42; Monk Dep., Exh. "F," at 29:4-6; Curry Dep., Exh. "G," at 10:5-11:10. The paramedics told the officers present they thought he would be fine. *See* Exh. "B," at 44:25-45:3; Ray Dep., Exh. "H," at 22:20-23:5; Doc. [26-1]; Doc. [26-2].

Surveillance cameras in the booking area show that at least one jailer was almost always stationed at the booking desk just a few feet from the holding cell where McDougle was housed, and jailers checked on McDougle multiple times throughout the night. *See* Exh. "C." At approximately 10:57 p.m., jailer Deshaun Groves took McDougle a cup of water in his cell. *See* Exh. "C." Groves checked on him again at 11:19 p.m. *See* Groves Dep., Exh. "L," at 46:11-47:2. At approximately 1:14 a.m., Officer Pope from PPD checked on McDougle after returning to the jail on an unrelated matter, and McDougle again asked for water. *See* Pope Dep., Exh. "I," at 26:1-29:1. At that time, McDougle was not moaning or groaning and did not appear to be in pain. *Id*., at 29:2-7; Doc. [26-1]. At approximately 2:50 a.m., jailer Evelyn McBeath checked on McDougle in his cell, and jailer Harvey Hickman checked again at approximately 2:53 a.m. *See* Exh. "C"; McBeath Dep., Exh. "J," at 9:16-11:24 (appeared to be sleeping); Hickmon Dep., Exh. "K," at 16:19-17:17; Doc. [26-2]. Groves checked on McDougle again before leaving the jail around 3 a.m., and McDougle told him he had gone to the BP station earlier that night. Exh. "L," 57:2-58:9. At approximately 3:49 a.m., McBeath checked on McDougle again, and he asked for water. *See* Exh. "C"; Exh. "J," at 14:17-19. At 3:50 a.m., Hickman also checked on McDougle after McBeath told him he had requested water. *See* Exh. "C"; Exh. "K," at 18:1-14. At approximately 3:57 a.m., Hickman took McDougle a cup of water. *See* Exh. "C." At approximately 4:49 a.m., another jailer checked on McDougle. *See* Exh. "C." Jailer Burton O'Berry checked on McDougle at approximately 7:05 a.m. after getting to work, and McDougle appeared to be asleep. *See* O'Berry Dep., at Exh. "M," at 20:1-21:1.

McDougle's condition appeared to remain the same throughout the night. *See* Exh. "F," at 31:7-13 ("I mean, every time I looked up, from the time he come in to the time I left (at 3 a.m.), he was the same."); Exh. "L," at 46:11-47:2, 57:2-58:9 (McDougle's condition was the same when Groves left at 3 a.m. as when McDougle first came in); Exh. "J," at 9:16-11:24, 14:15-15:22; Exh. "K," at 14:25-15:17; Exh. "M," at 20:1-21:1.

At approximately 7:30 a.m., jailer staff began passing out breakfast trays. *See* Exh. "C"; Exh. "K," at 20:21-21:1. When Hickmon opened the door of McDougle's cell to give him his breakfast tray, he observed McDougle laying on his back, but it did not appear he was breathing. *See* Exh. "K" at 21:2-9. Upon closer examination, the officers determined that McDougle was not breathing, and they could not find a pulse. *See* Exh. "K," at 28:22-29:10; Exh. "M," at 21:2-15. They immediately called for emergency assistance, and first responders arrived at 7:38 a.m. Exh. "C"; Exh. "M," at 23:4-6. Paramedics arrived a few minutes later and determined that McDougle was deceased. *See* Doc. [26-7].

Sheriff Tommy Waddell arrived at the jail at approximately 8:07 a.m., along with coroner Allen Collins and Chief Grant Myers of PPD. *See* Waddell Affidavit, Doc. [26-3]; Exh. "C." Sheriff Waddell was not present when McDougle arrived at the jail the night before, and he was not there at any time until after McDougle had been found dead. *Id*.

An autopsy conducted at the State Medical Examiner's Office determined McDougle's cause of death was head injury of an unknown origin and mixed drug toxicity. *See* Autopsy Report, Doc. [26-5]. Although there were no skull fractures or brain contusions, McDougle had a 0.2 cm abrasion on the central part of his forehead, and there was a focal area of hemorrhage on the right side of the skull with blood in the left subdural space. *Id*. There were no other signs of trauma anywhere on

his body. *Id*. There is no evidence that any force whatsoever was used against McDougle once he reached the Neshoba County Jail, and the source of the abrasion on McDougle's forehead or the subdural hemorrhage is currently unknown. Toxicology testing showed that McDougle had significant amounts of marijuana, marijuana metabolite, cocaine, amphetamine, and methamphetamine in his system at the time of his death. *Id*.

At the time of the subject incident, Neshoba County had in place written policies regarding intoxicated arrestees, inmate supervision, use of force, routine and emergency medical care, and inmate deaths. *See* Doc. [26-3]. Jailers received a copy of these and other written policies upon their hiring, and they also received training on jail policies and procedures from the State of Mississippi and/or on-the-job training. *Id*.

Based on the foregoing and the legal precedent discussed below, there are no genuine issues of material fact, and these Defendants are entitled to judgment as a matter of law.

## LAW AND ARGUMENT

### A.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. A dispute must be genuine and the facts must be material." *Professional Managers, Inc. v. Fawer, Bryan, Hardy and Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). The moving party has a duty to demonstrate

the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on the motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).

Once a properly supported motion for summary judgment is presented, the non-moving party must rebut with "significant probative evidence." *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1977). In other words, "The non-moving litigant is required to bring forth significant probative evidence demonstrating the existence of a triable issue of fact." *In re: Municipal Bond Reporting Anti-Trust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). Plaintiff may not rely on the mere denial of material facts, nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. A non-moving party's response, by affidavit or otherwise admissible evidence, must set forth specific facts showing that as to the matter at hand there is a genuine issue of material fact for trial. *Woods*, 687 F.2d at 119.

**B.      Jailers Monk, McBeath, Curry, Hickman, O'Berry, and Huthinson are entitled to qualified immunity from Plaintiff's federal law claims against them individually under 42 U.S.C. § 1983**

The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law. *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson*, 245 F.3d at 457. Qualified immunity "protects all public officers from individual liability except those 'who are plainly incompetent or who knowingly violate the law.'" *Malley v.*

*Briggs*, 475 U.S. 335, 340 (1986). Thus, if the Defendant jailers could reasonably have believed under the circumstances that their conduct was not a violation of the Plaintiff's constitutional rights, then he cannot be held liable. *Simpson v. Hines*, 903 F.2d 400, 402 (5th Cir. 1990).

Once a defendant asserts a good faith qualified immunity defense, the burden shifts to the plaintiff to show that the official's allegedly wrongful conduct violated clearly established law. *Thompson*, 245 F.3d at 456. "Negating qualified immunity 'demands more than bald allegations and conclusionary statements.'" *Fleming v. Tunica County*, 497 F. App'x 381, 388 (5th Cir. 2012).

Courts use a two-step analysis to determine whether qualified immunity applies. *Skinner v. Hinds County*, 2011 U.S. Dist. LEXIS 112724, 7 (S.D. Miss. Sept. 29, 2011). "[A] court addressing a claim of qualified immunity must determine first whether the plaintiff has adduced facts sufficient to establish a constitutional or statutory violation." *Id*. at 7-8, citing *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). Second, if a violation has been alleged, the court must determine "whether [the officers'] actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.*, at 8, quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). Whether an official acted with objective reasonableness is an issue of law reserved for the court. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

Plaintiffs have asserted federal claims against the Defendant jailers in their individual capacities for using excessive force against McDougle, for deliberate indifference to McDougle's medical needs, and for violating McDougle's right to equal protection. Defendants will address their entitlement to qualified immunity as to each of these claims, in turn.

          **1.**         **Defendant jailers have qualified immunity from Plaintiffs' claims of excessive force**

"The core inquiry in an . . . excessive use of force claim is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Skinner*, 2012 U.S. Dist. LEXIS 127264 at *9 (S.D. Miss. Sept. 7, 2012) (quoting *McClyde v. Jackson*, 405 F. App'x 891, 893 (5th Cir. 2010)).

Plaintiffs' excessive force claims against each of the Defendant jailers under the Fourteenth Amendment fail as a matter of law because there is no evidence that any of them used force of any kind against McDougle. Plaintiffs have failed to present any evidence that Monk, McBeath, Curry, Hickmon, O'Berry, or Hutchinson ever hit, punched, slapped, kicked, or tased McDougle at the Neshoba County Jail. Accordingly, there are no genuine issues of material fact as to Plaintiffs' excessive force claims against the Defendant jailers in their individual capacities, and Plaintiffs' claims in that regard should be dismissed as a matter of law.

### 2. Defendant jailers have qualified immunity from Plaintiff's claims of deliberate indifference to McDougle's medical needs

As a pretrial detainee, McDougle had a right under the Fourteenth Amendment not to be denied, by deliberate indifference, attention to his serious medical needs.[2] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). To demonstrate deliberate indifference, Plaintiff must present evidence: "(1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that the [defendant] subjectively intended

---

[2] Because McDougle at all relevant times was a pretrial detainee, his claims regarding inadequate medical care fall under the Fourteenth Amendment – not the Eighth Amendment, as alleged in the Fourth Amended Complaint. *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013). Accordingly, any claims asserted against these Defendants under the Eighth Amendment should be dismissed with prejudice as a matter of law.

that harm occur." *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013), citing *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009). To defeat any of the jailer's entitlement to qualified immunity, Plaintiff must show each jailer knew that McDougle faced a substantial risk of serious harm and that the jailer intentionally disregarded that risk. *Lewis v. Pugh*, 289 F. App'x 767, 772 (5th Cir. 2008). Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Hare v. City of Corinth*, 74 F.3d 633, 645, 649-50 (5th Cir. 1996) (en banc).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). A showing of deliberate indifference requires evidence that prison officials "refused to treat [the plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Deliberate indifference is an "extremely high" standard to meet. *Id.*

In a fairly recent Fifth Circuit case instructive to the present action, an arrestee was found dead in her cell hours after she was brought in appearing "very intoxicated" due to alcohol (0.39% BAC) and excessive use of prescription medicine. *See Wansley*, 524 Fed. Appx. 963, 967-968. In reversing the district court and finding that the defendant jailers were entitled to qualified immunity as to the plaintiff's claims of deliberate indifference to the decedent's serious medical needs, the Fifth Circuit held that "it seems objectively reasonable for the Jailers to allow an intoxicated inmate to 'sleep it off,' with periodic monitoring to safeguard her well-being." *Id.*, at 972. The *Wansley* court quoted the following excerpt from a similar Fourth Circuit case:

> [The deceased inmate's] symptoms hardly distinguish him from the multitude

of drug and alcohol abusers the police deal with everyday. [The deceased inmate] was found in possession of drugs while acting irrationally and slurring his speech. However, an officer could hardly be faulted under [*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)] for believing that [the deceased inmate] needed nothing so much as to sleep it off. To accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take.

*Id.*, quoting *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).

In the present action, it is undisputed that jail officers on duty actually had two nationally-registered paramedics, Brandi Wyatt and Dereck Moore, examine McDougle within minutes after he arrived at the Jail. Although McDougle appeared to be agitated and refused to answer certain questions, the paramedics found McDougle responsive and oriented. *See* Exh. "D," at 37-38, 45-46; Exh. "E," at 24-25, 36. The paramedics found that McDougle had good blood circulation, a normal pulse, normal pupils, and only slightly elevated respiration and blood glucose levels. *See* EMS Records, Doc. [26-7]; Exh. "D," at 17-18, 20, 38-39; Exh., "E," at 26-27, 35-36. They also found no obvious signs of trauma, serious injury, or life-threatening conditions. *See* Doc. [26-7]; Exh. "D," at 39-40, 53-55; Exh. "E," at 37, 45, 47, 49-50. Both paramedics testified that based on their examination of McDougle, they found it unnecessary to consult with an ER physician regarding McDougle's medical condition. *See* Wyatt Dep., Exh. "E," at 55:15-25; Moore Dep., Exh. "F," at 52:7-53:17. They further testified they did not find anything during their examination of McDougle that warranted transporting him to the ER for further evaluation. *See* Exh. "E," at 56:21-57:7; Exh. "F," at 51:21-52:2. They also both testified that if they had believed he needed to be transported, they would have done so. *See* Exh. "E," at 57:8-10; Exh. "F," at 52:3-6. Plaintiffs cannot credibly argue that McDougle's condition was such that a layperson would recognize it as a "serious medical

need" when trained and certified paramedics did not recognize it as such.

It is further undisputed that jail officials continued to monitor McDougle throughout the night without noting anything that would indicate his condition had deteriorated or that he needed emergency medical treatment. *See* Exh. "C"; Exh. "F," at 31:7-13 ("I mean, every time I looked up, from the time he come in to the time I left (at 3 a.m.), he was the same."); Exh. "L," at 46:11-47:2, 57:2-58:9 (McDougle's condition was the same when Groves left at 3 a.m. as when McDougle first came in); Exh. "J," at 9:16-12:12, 14:15-15:22 (McDougle asked McBeath for water around 4 a.m.); Exh. "K," at 14:25-15:17; Exh. "M," at 20:1-21:1 (appeared to be sleeping at 7:05 a.m.). There also is no evidence that McDougle ever asked any of these Defendants for additional medical treatment at any point prior to him being found unresponsive in his cell at 7:30 a.m.

Given that each of the Defendant jailers reasonably relied upon the judgment of two trained medical professionals, Plaintiff cannot establish a claim of simple negligence, much less that any of the Defendant jailers were deliberately indifferent.

Moreover, Plaintiffs cannot establish that the actions of any of the Defendant jailers were objectively unreasonable in light of clearly established law at the time of the conduct in question, as there is no case law that requires jail personnel to possess or exhibit medical judgment superior to that of professionally-trained medical personnel – who in this case did not believe McDougle needed any additional medical treatment. *See Pernell v. City of Columbus* (N.D. Miss. Apr. 27, 2010), citing *Burns v. City of Galveston, Texas*, 905 F.2d 100, 104 (5th Cir. 1990) (holding police officers have no legal duty to diagnose medical conditions, as such requires the skills of an "experienced medical professional").

For the foregoing reasons, there are no genuine issues of material fact as to Plaintiffs'

deliberate indifference claims against the Defendant jailers, and Plaintiffs' claims in that regard should be dismissed as a matter of law.

### 3. Defendant jailers have qualified immunity from Plaintiffs' equal protection claims against them

Plaintiffs appear to assert a claim against these Defendants for violating their right to equal protection under the Fourteenth Amendment. *See* Doc. [124], at Count Three. Any attempted equal protection claim must contain an allegation that a state actor intentionally discriminated against the plaintiff because of membership in a protected class or due to an irrational or arbitrary state classification unrelated to a legitimate state objective. *Washington v. Davis*, 426 U.S. 229, 247-48 (1976). A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity and does not violate the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312 (1993).

Plaintiffs' Fourth Amended Complaint fails to allege any facts whatsoever to support an equal protection claim under the Fourteenth Amendment. There is no allegation that McDougle was intentionally discriminated against compared to similarly-situated inmates at the Neshoba County Jail based on his membership in any protected class, much less that any of these Defendants were personally involved in any such discrimination. There also is no evidence in the record before the Court to support any such claim.

Accordingly, there are no genuine issues of material fact as to Plaintiffs' equal protection claims against these Defendants, and Plaintiffs' claims in that regard should be dismissed.

**C.  Plaintiffs' federal claims against Sheriff Waddell and Jailers Monk, McBeath, Curry, Hickmon, O'Berry and Hutchinson in their official capacities are duplicative of their claims against Neshoba County and should be dismissed**

It is well established that a suit against a government officer, such as a sheriff or jail officer, in his official capacity is a suit against the office that the employee holds and not the employee named.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (holding the "real party in interest in an official capacity suit is the government entity and not the named official.").  Because Plaintiffs have already named Neshoba County as a Defendant in this case, their claims against Sheriff Waddell and Jailers Monk, McBeath, Curry, Hickmon, O'Berry, and Hutchinson in their official capacities are duplicative of the claims against Neshoba County and should be dismissed.[3]

**D.  Plaintiff has failed to establish a constitutional claim against Neshoba County**

Municipal liability under Section 1983 requires proof of three elements: (1) a policymaker; (2) an official policy; (3) and a violation of constitutional rights whose "moving force" is the policy or custom of the municipality.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 694 (1978).  A municipality may not be held liable under Section 1983 on the basis of *respondeat superior*.  *Piotrowski*, 237 F.3d at 578.  The custom, policy, or practice of the governmental entity must actually cause a deprivation of constitutional rights.  *See Monell*, 436 U.S. at 690-692.  Not only must Plaintiffs establish that a policy or custom of the municipality was the "moving force" behind the alleged violation of a constitutional right; they must also establish that the municipality was "deliberately indifferent" to the known consequences

---

[3] Plaintiffs' Fourth Amended Complaint names Sheriff Waddell as a Defendant in his official capacity only.

of the policy. *Piotrwoski*, 237 F.3d at 580. The Fifth Circuit has noted that the plaintiff bears an "extremely heavy burden" in establishing both the municipality's deliberate indifference and a causal link between the alleged custom and the alleged constitutional violation. *Id.* The inadequacy of a policy or custom and its likelihood to result in a violation of constitutional rights must be blatantly obvious before policymakers can be held liable for a violation of constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Plaintiffs' Fourth Amended Complaint asserts a vague and conclusory allegation that Neshoba County and the City of Philadelphia are liable for implementing official policies, customs, or practices that were the moving force behind the alleged violations of McDougle's constitutional rights. *See* Doc. [124], at ¶24.

As an initial matter, Plaintiffs' constitutional claims against Neshoba County fail because McDougle's constitutional rights were not violated. As set forth *supra*, Plaintiffs cannot establish that McDougle was subjected to excessive force at the Neshoba County Jail, nor can they establish that jail officials were deliberately indifferent to his serious medical needs or that they violated his right to equal protection. Because Plaintiffs cannot establish that McDougle's constitutional rights were violated in any way, they certainly cannot demonstrate that a municipal policy of Neshoba County was the moving force behind any such deprivation.

Furthermore, Neshoba County had policies in place that sufficiently addressed intoxicated arrestees and the provision of both routine and emergency medical care to inmates. *See* Waddell Affidavit and Policies, Doc. [26-3]. According to jail policies, when an arrestee arrived at the jail in an intoxicated state – as McDougle appeared to be on the night of his arrest – he was to be visually observed in an attempt to reduce the possibility of harm to himself. *Id.* Intoxicated arrestees were

to be placed in a holding cell within view of the booking room officer on duty, which was done here. *Id*.  Policy further states that an intoxicated arrestee will remain in the holding cell until he no longer exhibits signs of intoxication, and staff on duty were directed to observe the intoxicated inmate "on a regular basis." *Id*.  It is undisputed that McDougle was kept in a holding cell just a few feet from the desk of the booking officer on duty the entire time he was at the jail.  It is further undisputed that officers checked on McDougle multiple times throughout the night, including several instances where he was provided water after he requested the same.

Jail policies also provided for access to appropriate health care services for inmates' physical and mental health.  *See* Doc. [26-3].  The jail has a staff nurse that serves as the primary health care provider for inmates, under standing orders from a local physician.  Policies also provide for a medical screening by the booking officer upon admission to the jail, and jail staff on duty are instructed to arrange for medical services without undue delay in the event of a medical emergency or perceived medical emergency.  *Id*.  In this case, jail officials had paramedics examine McDougle shortly after he arrived since he had supposedly been tased at the scene of his arrest and due to his seemingly intoxicated state.  *See* EMS Records, Doc. [26-7].  It is undisputed that after examining McDougle, the paramedics determined that an ER physician did not need to be consulted and that it was unnecessary to transport McDougle to the local hospital for further treatment.  It is further undisputed that jail officials continued to monitor McDougle throughout the night without any indication that his condition had deteriorated or that he needed emergency medical treatment.  There also is no evidence that McDougle ever asked for help or additional medical treatment at any point prior to him being found unresponsive in his cell at 7:30 a.m.

There were also policies in place regarding the death of an inmate at the jail.  The staff person

who discovers the inmate's body was to immediately notify the sheriff and jail administrator, and emergency medical personnel were to immediately be summoned to the jail. *See* Doc. [26-3]. As shown by the EMS records and surveillance video, first responders were immediately called and arrived at McDougle's cell within minutes of officers discovering that he was unresponsive.

Additionally, even though there is no evidence whatsoever that force was used against McDougle at any point while he was at the Neshoba County Jail, there were also policies in place regarding the use of force. *See* Doc. [26-3].

The policies implemented at the county jail at the time of the subject incident were clearly sufficient to provide for the safety and well being of pretrial detainees, such as McDougle.

To the extent Plaintiffs attempt to assert a constitutional claim against Neshoba County based on insufficient training, they must prove the following: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009). When a plaintiff seeks to impose Section 1983 liability on a municipality for its failure to train its employees, normal tort standards are replaced with heightened standards of culpability and causation. *Williams v. City of Cleveland*, 2012 U.S. Dist. LEXIS 117559, 53-54 (N.D. Miss. Aug. 21, 2012).

Claims of inadequate training generally require that the plaintiff demonstrate a pattern of constitutional violations. *Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 n. 34 (5th Cir. 2005); *Lewis v. Pugh*, 289 F. App'x 767, 772 (5th Cir. 2008) (citing *Thompson v. Upshur County*, 245 F.3d 447, 458 (5th Cir. 2001) ("Proof of more than a single instance . . . is required before such a lack of training can constitute deliberate indifference.")). Plaintiffs must "demonstrate that the municipality

or supervisor had notice of a pattern of prior acts fairly similar to what ultimately transpired." *Lewis*, 289 F. App'x at 772 (internal citations omitted).

"[The Fifth Circuit] consider[s] compliance with state requirements as a factor counseling against a 'failure to train' finding." *Williams v. City of Cleveland*, 2012 U.S. Dist. LEXIS 117559, 58 (citing *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161, 167 (5th Cir. 2010)). Likewise, the Fifth Circuit has explained that when officers have received training as required by state law, the plaintiff must show that the legal minimum of training was inadequate. *See Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). Such evidence has not been presented in this case.

In the present action, each jail officer was provided a copy of the jail's policies upon their hiring, and officers also received jail policies and procedures through the State of Mississippi and/or on-the-job training. *See* Doc. [26-3]. In fact, each of the Defendant jailers except for Burton O'Berry – who was hired at the Neshoba County Jail approximately one week prior to the subject incident[4] – had previously been certified by the State of Mississippi Board on Jail Officer Standards and Training. Jail Standards Training Certificates, Exh. "N." Further, Plaintiffs cannot present any prior, similar instances involving constitutional violations at the Neshoba County Jail dealing with deliberate indifference toward a detainee's serious medical needs.

For all of the foregoing reasons, Plaintiffs have failed to establish a genuine issue of material fact as to their constitutional claims against Neshoba County, and Plaintiffs' claims in that regard should be dismissed as a matter of law.

---

[4] *See* Exh. "M," at 22:18-24.

**E.** **Plaintiff's state law claims against the Neshoba County Defendants are barred by the immunities and protections of the MTCA**

To the extent Plaintiffs assert claims against these Defendants under state law for negligence, gross negligence, carelessness, reckless disregard, assault and battery, negligent or intentional infliction of emotional distress, and wrongful death, these claims are subject to the protections, limitations, and immunities of the Mississippi Tort Claims Act ("MTCA"), as codified at MISS. CODE ANN. § 11-46-1, *et seq*. The MTCA is the exclusive route for filing suit against a governmental entity and its employees in Mississippi. *See* MISS. CODE ANN. § 11-46-7(1). Accordingly, the MTCA is the sole authority – statutory or otherwise – which governs the rights and liabilities of the parties to this action under Plaintiff's state law claims.

**1.** **Defendants Monk, McBeath, Hickman, O'Berry, Hutchinson, and Curry have immunity from Plaintiff's state law claims against them in their individual capacities under MISS. CODE ANN. § 11-7-6(2).**

To the extent Defendants Monk, McBeath, Hickman, O'Berry, Hutchinson, and Curry were acting pursuant to and within the scope of their employment with Neshoba County, they are immune from individual liability, as provided by the MTCA:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but **no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.**

MISS. CODE ANN. § 11-46-7(2). Accordingly, a government employee is not subject to individual liability under state law for acts or omissions that occur while performing his or her job duties.

The allegations against the jailer Defendants are clearly all based on alleged acts or omissions occurring during the course and scope of their employment as jailers with Neshoba County. To the

extent Plaintiffs' Fourth Amended Complaint asserts vague and conclusory allegations of intentional conduct that would otherwise fall outside the scope of the MTCA, Plaintiffs' claims in that regard are not directed to any specific Defendant, nor have they produced any evidence to support such claims against any of the Neshoba County Defendants.

As such, these Defendants are immune from any state law claims that may be asserted against them in their individual capacity.

**2.      Each of the Neshoba County Defendants have immunity from Plaintiffs' state law claims against them under MISS. CODE ANN. § 11-46-9(1)(m).**

The MTCA provides that a governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

> Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed.

MISS. CODE ANN. § 11-46-9(1)(m).

The claims against each of the Neshoba County Defendants arise strictly out of alleged events that occurred while McDougle was detained at the Neshoba County Jail. Therefore, these Defendants have immunity from Plaintiff's state law claims against them, pursuant to Section 11-46-9(1)(m). *See Johnson v. Epps*, 583-592-593 (5th Cir. 2012). As such, there are no genuine issues of material fact as to Plaintiff's state law claims against these Defendants, and Plaintiff's claims in that regard should be dismissed.

**3.      Plaintiffs' claims against these Defendants are barred due to their failure to comply with the MTCA's mandatory pre-suit notice requirements**

Pursuant to the MTCA, a person filing suit against a government entity must first file a notice

of claim with the chief executive officer of the government entity at least 90 days before instituting suit. MISS. CODE ANN. § 11-46-11(1). For claims against a county, such as Neshoba County, service must be made upon the chancery clerk. § 11-46-11(2)(a)(i). The notice must be in writing, must be delivered in person or by United States certified mail, and must contain a short and plain statement of the facts upon which the claim is based, including the circumstances which brought about the injury, the extent of the injury, the time and place the injury occurred, the names of all persons known to be involved, the amount of money damages sought, and the residence of the person making the claim at the time of the injury and at the time of filing the notice. § 11-46-11(2)(b).

In the present action, Plaintiffs did not attempt to file a notice of claim with Neshoba County until May 7, 2015, or just one day prior to filing their original Complaint in federal court. *See* Notice of Claim, Doc. [26-10]. *See also* Complaint, Doc. [1]. Because Plaintiffs failed to comply with the MTCA's 90-day notice requirement, their state law claims against these Defendants are barred and must be dismissed. *See Jones v. Laurel Family Clinic, P.A.*, 37 So. 3d 665, 668 (Miss. Ct. App. 2010) (holding that "the ninety-day notice requirement under section 11-46-11(1) is a hard-edged, mandatory rule which the Court strictly enforces."). Additionally, Plaintiffs' notice of claim was directed to the "Neshoba County Sheriff's Office," instead of the Neshoba County Chancery Clerk as required by statute. *See* Doc. [26-10]. Thus, Plaintiffs' state law claims against these Defendants are barred for this reason, as well.

## CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact as to Plaintiffs' claims against the Neshoba County Defendants, and these Defendants are entitled to judgment as a matter of law.

Respectfully submitted, this the 21st day of October, 2016.

> SHERIFF TOMMY WADDELL, AMANDA
> MONK, EVELYN MCBEATH, HARVEY
> HICKMAN, BURTON O'BERRY, JAMIE
> HUTCHINSON, JOEY CURRY, AND NESHOBA
> COUNTY, MISSISSIPPI
>
> BY: /s/ *Steven J. Griffin*
>        OF COUNSEL

ROY A. SMITH, JR. - BAR # 7599
rsmith@danielcoker.com
STEVEN J. GRIFFIN - BAR # 103218
sgriffin@danielcoker.com
DANIEL, COKER, HORTON & BELL, P.A.
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI  39215-1084
TELEPHONE:  (601) 969-7607
FACSIMILE:  (601) 969-1116

## CERTIFICATE OF SERVICE

I, Steven J. Griffin, of counsel for the Neshoba County Defendants do hereby certify that I have this day served by United States mail a true and correct copy of the above and foregoing pleading to:

> Carlos Moore, Esq.
> carlos@carlosmoorelaw.com
>
> ***Attorney for Plaintiff***
>
> John D. Price, Esq.
> jdp@wisecarter.com
>
> Jason D. Childress, Esq.
> jdc@wisecarter.com
>
> ***Attorneys for City of Philadelphia, Chief Grant Myers, Brad Crockett, Eric
> Lyons, and Brandon Pope***

THIS, the 21st day of October, 2016.

> /s/ *Steven J. Griffin*